IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENWOOD DIVISION

IN THE MATTER OF THE            )
APPLICATION OF THE UNITED        )
STATES OF AMERICA FOR AN ORDER   )
AUTHORIZING                      )
SEARCH WARRANTS FOR THE          )
FOLLOWING LOCATIONS:             )
(1) 320 Scenic Lake Court, Piedmont,  )
South Carolina (TL#1),           )
(2) 4090 Jefferson Davis Road, Mountville,  )
South Carolina (TL#2),           )
(3) 6145 Highway 221 South Laurens,  )
South Carolina (TL#3).           )

6:19-cr-203
~~MISC. NO.: 6:18-357~~

**(Under Seal)**

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Randy L. Smith, a Special Agent with the Drug Enforcement Administration (DEA),

being duly sworn, depose and state:

1.  As a Special Agent (SA), I am an Investigative or Law Enforcement Officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516(1)(e).

2.  I am a Special Agent for the Drug Enforcement Administration and have been employed in that capacity for more than twenty-eight (28) years. During the course of my employment as a Special Agent, I have attended numerous schools, in-service training and specialized training in the investigation, identification and detection of narcotics. I have received fourteen (14) weeks of intense narcotics training at the Drug Enforcement Administration's Basic Agent School in Quantico, Virginia. I have

been involved in hundreds of investigations involving the use, sale and delivery of narcotics. In addition, I am familiar with the practice of individuals involved with the distribution of narcotics. I make this affidavit based on my professional and personal knowledge, together with information I have received from other persons that I believe to be credible, to include other law enforcement officers. I am familiar with and have participated in all of the normal methods of investigations, including, but not limited to, visual surveillance, detailed interviews of witnesses, use of search warrants, use of confidential sources, supervision of Title III intercepts, supervision and analysis of pen register coverage, and Federal Grand Juries. As a Special Agent with the DEA, I have conducted investigations of violations of the Controlled Substance Act, including, but not limited to, cocaine and heroin trafficking, and international drug smuggling. These investigations involved high-level drug traffickers operating throughout the United States, Mexico, Colombia, and other Central and South American countries. As part of my duties as a DEA Special Agent, I have participated in ten (10) investigations involving the use of wire and electronic communications interceptions. I have participated in all areas of the utilization of wire and electronic communications interceptions, including investigation, preparation of affidavits, analysis, monitoring, technical operations, surveillance, arrests, and prosecution. I have received training, both formal and informal, in all levels of drug trafficking and money laundering, including, but not limited to, the DEA basic drug investigation courses; money laundering investigations; wiretap investigations; and the DEA's Basic Agent Training Academy located at Quantico, Virginia.

## PREMISES TO BE SEARCHED

3.    This affidavit is being submitted in support of an application for search warrants at the following locations in the District of South Carolina (hereinafter collectively referred to as the PREMISES TO BE SEARCHED, or TARGET LOCATIONS). At these locations it is expected that there will be recovered fruits, evidence and/or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to possess and

distribute controlled substances) and 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) and 18 U.S.C. § 856 (maintaining a drug-involved premise). The TARGET LOCATIONS are more fully described as follows:

a. **TARGET LOCATION #1** is a house located at **320 Scenic Lake Court, Piedmont, South Carolina 29673**. Traveling South on SC-291 from Greenville, South Carolina, you would turn left onto Old Augusta Road, and a slight left onto Fork Shoals Road. One would continue South on Fork Shoals until you reached Log Shoals Road. You will turn Right onto Log Shoals Road and the Left onto Quite Lake Court. Once on Quite Lake Court, turn Left onto Scenic Lake Court. 320 Scenic Lake Court will be on the Right. The residence located at 320 Scenic Lake Court is further described as a three level single family dwelling composed of brown brick, and tan vinyl siding with brown shutters. The roof is composed of gray slate shingles. A photograph of TARGET LOCATION #1 is provided in Attachment A to the Application and Search and Seizure Warrant for TARGET LOCATION #1.

b. **TARGET LOCATION #2** is a house located at **4090 Jefferson Davis Road, Mountville, South Carolina 29370**. If one was traveling South on Old Milton Road in Laurens County from Clinton, South Carolina, you would make a sharp right turn onto Jefferson Davis Road. You will continue South West on Jefferson Davis Road, and then turn right onto Hollow Drive. Once on Hollow Drive, bear to the right when the road splits, and 4090 Jefferson Davis Road will be on the right. 4090 Jefferson Davis Road is further described as a house with a gray slate shingled roof. The exterior of the house is off white, with light blue shutters. A photograph of TARGET LOCATION #2 is provided in Attachment A to the Application and Search and Seizure Warrant for TARGET LOCATION #2.

c. **TARGET LOCATION #3** is a double wide trailer and outbuildings located at **6145 Highway 221 South Laurens, South Carolina 29360**. If one were traveling South East on Interstate 385 from Greenville, South Carolina, you would take Exit 9, US-221 towards Laurens/Enoree. Keep left to take the ramp

3

towards Laurens. Turn left onto Highway 221/US-221 South, continue to follow US-221 South. 6145 Highway 221 South will be on your left. 6145 Highway South is further described as a white vinyl sided double wide mobile home, with a black slate roof, black shutters and a covered front porch. There is also an outbuilding that has white siding, several windows on the side near the property boundary and a small wooden deck that has patio furniture with a red umbrella. Adjacent to this building is a second barn shaped outbuilding that is brown in color, with a dark colored roof. On the property, to the far left of this outbuilding is a white and black metal-type building. A photograph of TARGET LOCATION #3 is provided in Attachment A to the Application and Search and Seizure Warrant for TARGET LOCATION #3.

4.  This application also seeks authorization to search any vehicles which may be located at any of the TARGET LOCATIONS.

5.  Based upon my training and experience as a narcotics agent, I know the following:

    a.  Drug traffickers frequently store controlled substances and drug paraphernalia for packaging, diluting, weighing and/or distributing controlled substances in, on, and around their residences and/or business, and within vehicles and/or structures located on their property or its surrounding curtilage in an effort to avoid detection by law enforcement. This paraphernalia often includes but is not limited to: scales, plastic bags, diluting agents, etc.

    b.  Drug traffickers keep large amounts of currency on hand in order to maintain and finance their ongoing drug business. Drug traffickers frequently store currency, financial instruments, precious metals, jewelry, and other items of value, which are the proceeds of drug transactions inside, on, and around their residences and/or places of business (including buried on the grounds thereof).

c.  Drug traffickers frequently have in their possession, whether on their person, inside their vehicle, or in, on, or around their residence, firearms and other weapons. These firearms and weapons are commonly used by drug traffickers to protect their property, including, but not limited to: controlled substances; drug proceeds in the form of currency, jewelry and other real property; and other items of value whose existence may be considered illegal.

d.  Drug traffickers frequently maintain in their residence and/or business, records of drug transactions, real estate and business transactions, wire transfers, safe deposit box keys, money wrappers, and other evidence of other financial transactions, including notes, ledgers, receipts, computer files, photographs, video tapes, digital video recorders and associated hard drives memorializing footage generated by closed circuit or internet-based video camera systems, telephone records, calling cards, and correspondence which contain information on current and past associates, and may be used to identify co-conspirators who have not been identified or located.

e.  Drug traffickers frequently maintain fictitious identification and other documents which are intended to conceal their identity and avoid detection by law enforcement, including fictitious driver licenses, passports, photo identification cards, and documents relating to fraudulently obtained vehicle titles, registrations, and insurance.

f.  Drug traffickers frequently maintain in their residence currently and previously used wireless telephones and/or electronic communications devices, particularly those wireless telephones and/or electronic communications devices which require the telephone and/or electronic communications device to be purchased. Drug traffickers frequently store digital and voice messages and phone numbers, belonging to drug purchasers, and other drug traffickers.  It is common for drug traffickers to store photographs and electronic images of themselves with their associates of the drug trafficking organization, drugs and/or guns, and assets

including large amounts of currency and vehicles. Traffickers often maintain these images on cellphones and smart phones.

g. Drug traffickers regularly use computers in furtherance of drug trafficking and money laundering crimes, by maintaining records and ledgers on the hard drives (or associated removable media) of said computers. Drug traffickers and money launderers also regularly use computers to communicate with one another by way of e-mail, or other telecommunications devices using voice over internet protocol (VOIP), which work in conjunction with computers.

h. Drug traffickers and money launderers maintain books, records, receipts, notes, ledgers, currency and papers which are evidence of the commission of their narcotics and money laundering offenses. The records include tally or ledger sheets; sales and/or purchase invoices; bank, wire transfer and/or other financial institution records; federal and state corporate, partnership, individual and/or other tax and informational returns filed or required to be filed.

i. Drug traffickers frequently engage in money laundering in an effort to conceal the proceeds derived from the distribution of illegal drugs, and present them as legitimate revenues. Drug traffickers and money launderers will also regularly utilize drug proceeds to procure goods (including but not limited to real estate, jewelry, automobiles, electronics, etc.) and services which will be used in the course of a legitimate business venture. Drug traffickers often use drug proceeds to acquire and/or operate ostensibly legitimate businesses to provide a front for their illegal activity and to facilitate the laundering of drug proceeds.

j. Drug traffickers and money launderers will regularly purchase goods and services using alias names, nominee names, or the names of criminal associates engaged in the ongoing drug trafficking or money laundering enterprise, or under the name(s) of a business or organization ultimately controlled and/or operated by the drug trafficking or money laundering organization. Even though these assets are in the

names of others, drug traffickers actually own, continue to use and exercise dominion and control over them.

k.      Drug traffickers frequently store currency in multiple locations to avoid discovery and seizure of all drug proceeds from law enforcement during an arrest and/or search.

6.  The information that follows is not an exhaustive recitation of everything I know about this investigation, it is merely meant to provide information that establishes probable cause to obtain the warrants requested herein. Additionally, the information in this affidavit was derived from my personal involvement in the investigation, as well as from a review of investigative reports, as a result of interviews with other law enforcement officers who have participated in the investigation, and a review of financial records, documents, data, reports and other material relevant to the investigation of the case.

## BACKGROUND

7.  On September 26, 2018, agents with the DEA Las Cruces, New Mexico Resident Office were alerted by a Source of Information (SOI) that Jamal LATIMER, an individual from the upstate region of South Carolina, contacted individuals in Mexico in search of cocaine and heroin. Agents confirmed and followed up on the lead which led to LATIMER traveling from South Carolina to El Paso, Texas to hammer out a deal with individuals he believed to be the sources of the cocaine and heroin.

8.  At the meeting in El Paso on October 3, 2018, agents introduced two undercover officers (who represented themselves as the sources of the cocaine and heroin) to LATIMER. During this meeting, LATIMER agreed to purchase ten (10) kilograms of cocaine and ten (10) kilograms of heroin for $760,000.00. During the meeting,

LATIMER specifically requested "China White"[1] heroin and stated that his drug trafficking organization pressed and sold the heroin in pill form to its customers. The cocaine and heroin were to be delivered to LATIMER in Greenville, South Carolina at a later date.

9.     Through continued discussions with LATIMER after the El Paso meeting, the undercover officers agreed that the drug transaction would occur in Greenville on October 23, 2018. On the day of the scheduled transaction, as LATIMER and associate Christopher CUNNINGHAM were enroute to the delivery location, agents coordinated traffic stops of vehicles driven by CUNNINGHAM and a second vehicle driven by Donald THOMAS. During the traffic stops, officers located and seized $1,004.665.00 in United States currency.[2]

10.    During the operation, surveillance agents observed LATIMER and Detric MCGOWAN (who had arrived in a separate vehicle) maneuver his (MCGOWAN's) vehicle in a manner consistent with counter-surveillance. Agents then observed LATIMER join MCGOWAN in the rear parking lot of a hotel off the interstate where the two men positioned themselves to avoid being seen as they watched officers locate and seize the currency. Based on telephone toll records, a phone known to be used by MCGOWAN was in contact with a phone used by LATIMER twenty-five (25) times on October 23, 2018 during and around the time of the operation.

11.    On December 28, 2018, United States District Judge Donald C. Coggins, Jr., authorized the interception of wire communications over TT-1 (770) 680-9674, a phone used by LATIMER. On January 25, 2019, Judge Coggins, authorized the interception of wire communications over TT-2 (864) 517-5419 and TT-3 (864) 321-5920, both used by MCGOWAN.

_____

[1] "China white" is a term used to refer to pure or high grade heroin and heroin mixed with the synthetic opioid fentanyl.

[2] In count 4 of the indictment, MCGOWAN, THOMAS, LATIMER and CUNNINGHAM are charged with conspiracy to commit bulk cash smuggling, in violation of Title 18, U.S.C. § 371 and Title 31, U.S.C. § 5332(a)(1).

12.    As discussed more fully below, evidence gathered through the interception of calls over TT-1, TT-2, TT-3 and the investigation by law enforcement has established that MCGOWAN is a leader of a drug trafficking organization based in upstate South Carolina.    Agents have determined MCGOWAN and Lauren Brook POORE, MCGOWAN's long time paramour, reside at 320 Scenic Lake Court, Piedmont, South Carolina (TARGET LOCATION #1).[3]

13.    Through physical surveillance and intercepted telephone calls over TT-2 and TT-3, the investigation has revealed that MCGOWAN and others use a pill press to mass produce heroin/fentanyl pills.    Based on drug seizures, cooperating source information, a review of financial records,[4] physical and electronic surveillance, including intercepted wire calls, I believe the pill press was being used to manufacture illicit pills at a stash house located at 4090 Jefferson Davis Road, Mountville, South Carolina (TARGET LOCATION #2) for at least two years up to February 5, 2019.    Based on physical and electronic surveillance, including intercepted calls, I believe that on February 5, 2019, MCGOWAN moved his manufacturing operation from 4090 Jefferson Davis Road in Mountville to 6145 Highway 221 South Laurens, South Carolina (TARGET LOCATION #3).

14.    On February 19, 2019, a federal grand jury, finding sufficient probable cause, returned a multi-count indictment charging MCGOWAN, THOMAS, LATIMER, CUNNINGHAM, Richard LONGSHORE, Celeste BLOCKER, Eddie Lee CHILDS, Trevor HULL and Danny LOPEZ and others with, from in and around 2016 up to and including the dated of the indictment, conspiracy to possess with intent to distribute

---

[3] During the week of December 17, 2018, physical surveillance by law enforcement confirmed that MCGOWAN and POORE began to move into TARGET LOCATION #1. Electronic and physical surveillance confirms that MCGOWAN and POORE continue to reside together at TARGET LOCATION #1.

[4] Pursuant to a grand jury subpoena, agents obtained and reviewed McGowan's bank account records. According to the records, on August 11, 2017, McGowan's PayPal linked checking account was debited twice by CapsulCN International, Co., LTD for the cost of replacement parts for a pill press machine. Based on my agents' knowledge and research concerning various pill press types and models, I believe the model for which the parts were purchased by MCGOWAN is a model that is capable of manufacturing at least 5,000 pills per hour.

heroin, a Schedule I controlled substance, and cocaine and N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), Schedule II controlled substances, in violation of Title 21 U.S.C. § 846, and other drug-related offenses.

15.    Further, in addition to the numerous drug-related charges against MCGOWAN and others, the indictment charges that from September 2017 through October 2018, MCGOWAN and POORE, the two residents of TARGET LOCATION #1, conspired to structure financial transactions, totaling approximately $133,600, to evade currency reporting requirements, in violation of Title 31, U.S.C. § 5324(a).

16.    I know that unexplained wealth is probative of drug trafficking or other illicit gain. *United States v. Grandison,* 783 F.2d 1152, 1156 (1986) (finding that expenditures of large sums of cash prior to the defendant's arrest was clearly relevant "given the fact that [the defendant] was unemployed and only recently paroled."). *U.S. v. Puche–Garcia,* 230 F.3d 1356 (4th Cir. Sept. 13, 2000) (unpublished decision)("possession of a large amount of cash is strong evidence of a connection to drug activity" because the "common sense reality of everyday life is that [law-abiding citizens] do not transport large quantities of cash rubber-banded into bundles and stuffed into shopping bags").

17.    Based on agents' review of MCGOWAN and POORE's financial records, including bank account information and tax return information, agents have found no legitimate source of the currency involved in the structured transactions referenced above and alleged in the indictment.  Therefore, I believe the transactions were conducted with proceeds of drug trafficking and, therefore, also constitute concealment money laundering and money laundering transactions conducted to evade the currency transaction reporting requirements, in violation of Title 18, U.S.C. §§ 1956(a)(1)(B)(i) and 1956(a)(1)(B)(ii).[5]

---

[5] Title 18 U.S.C. §1956(a)(1) makes it a crime to knowingly conduct, or attempt to conduct a "financial transaction: with proceeds from "specified unlawful activity" with specific intent to conceal or disguise

18.   The indictment also charges MCGOWAN, LATIMER and LONGSHORE with a violation of Title 18, U.S.C. §§ 856(a)(1) and 2,  that is the use of TARGET LOCATION #2 for the purpose of unlawfully manufacturing, storing and distributing controlled substances, that is, a quantity of mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, and a quantity of mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl).

19.   I believe the physical and electronic surveillance, including interceptions over TT-1, TT-2 and TT-3,[6] drug and money seizures, have produced probable cause for search warrants to be issued for the TARGET LOCATIONS.

## CURRENT INVESTIGATION

20.   On January 26, and January 27, 2019, agents intercepted a series of calls between MCGOWAN and Celeste BLOCKER over TT-2 and TT-3. Based on the content of the conversations, agents were able to determine that on Monday, January 28, 2019, MCGOWAN and BLOCKER, of Fayetteville, North Carolina, and others were conducting a drug transaction (type and amount unknown) to occur at the Flying J Truck Stop off Interstate 20 at exit 70 near Columbia, South Carolina.

21.   On January 28, 2019, with electronic surveillance in place, agents established

---

the source, origin, nature, ownership, or control of the proceeds in violation of 18 U.S.C. §1956(a)(1)(B)(i); or evade reporting requirements in violation of 18 U.S.C. §1956(a)(1)(B)(ii).

Pursuant to 18 U.S.C. § 1961(1), drug trafficking in violation of 841(a)(1) and 846, is a specified unlawful activity ("SUA").

[6] On January 18, 2019, United States Magistrate Judge Kevin McDonald authorized the release of geo-location data for TT-2 and TT-3, both used by MCGOWAN. Since January 18, 2019, agents have collected location data (electronic surveillance) relative to TT-2.  During the course of my career, I have collected and analyzed location data relating to numerous telephones.  I have learned through my experience and my conversations with telephone service providers that the accuracy of that location data varies largely from telephone to telephone, pursuant to a variety of technological factors.  As it relates to TT-2, the accuracy of "pings" (i.e. GPS coordinates for TT-2, accompanied by a degree of confidence relating to the accuracy (radius) of the ping, provided in meters) has been larger in scope, usually showing a confidence of level of as close as 100 meters, to as broad as 12,000 meters.

physical surveillance near TARGET LOCATION #1 at 5:45 a.m.  At approximately 7:20 a.m., agents observed MCGOWAN, in his 2016 Nissan Maxima, drive away from the direction of TARGET LOCATION #1.  MCGOWAN was surveilled by agents as he drove to TARGET LOCATION #2.  The investigation later revealed TARGET LOCATION #2 as a location used by MCGOWAN and LONGSHORE to manufacture illicit pills.

22.   Based on conversations intercepted over TT-2 and TT-3 throughout the day on January 28, 2019, MCGOWAN continued to discuss and coordinate with others, including Eddie Lee CHILDS, BLOCKER and Danny LOPEZ, also of Fayetteville, North Carolina, the drug transaction to occur at the Flying J Truck Stop.

23.   At approximately 12:15 p.m., surveillance agents observed LOPEZ, driving a gold Honda Civic bearing a North Carolina license plate, meet with an individual, later identified as Trevor HULL, in a 1998 Green Ford pickup truck.  Agents observed LOPEZ enter the Ford pickup for less than a minute before he exited the pickup with something concealed under his jacket.  LOPEZ then returned to the Honda and drove away towards the state line in the direction of North Carolina.

24.   As LOPEZ drove back to Fayetteville, DEA agents arranged a walled off traffic stop of the LOPEZ' vehicle in Kershaw County, South Carolina by Kershaw County Sheriff's Office.  During the traffic stop, deputies searched the vehicle and located 14,385 blue tablets concealed in plastic wrapping. A forensic analysis has determined the substance found to be 1.542 kilograms of heroin. LOPEZ was arrested and charged with trafficking heroin.

25.   Throughout the aforementioned events, MCGOWAN, using TT-2 and TT-3 was providing information to BLOCKER and others regarding the status of delivery/drug transaction.  The conversations, in part, consisted of providing directions to HULL via CHILDS to the Flying J Truck Stop and receiving updates as to the status of the drug delivery. Calls between MCGOWAN and BLOCKER intercepted after LOPEZ' arrest, a review of LOPEZ' phone records and an interview of  LOPEZ himself,

confirm that HULL as directed by MCGOWAN and CHILDS, delivered the heroin pills to LOPEZ. LOPEZ, had traveled to Columbia from Fayetteville, at BLOCKER's direction, to pick up the drugs.

26.    On January 30, 2019, at approximately 8:10 a.m., agents established physical surveillance in the area of TARGET LOCATION #2. Around the same time, location data for TT-2 showed that MCGOWAN left the area of TARGET LOCATION #1. During one call intercepted over TT-2 between MCGOWAN and LONGSHORE, MCGOWAN advised LONGSHORE that they "needed water".[7] Based on the intercepted conversation, agents believe that LONGSHORE was already at TARGET LOCATION #2 at the time of the call and that MCGOWAN was driving to meet LONGSHORE at TARGET LOCATION #2. Based on the investigation to date, I believe that MCGOWAN and LONGSHORE were meeting at TARGET LOCATION #2 for the purpose of manufacturing heroin/fentanyl pills.

27.    The same day at approximately 11:57 a.m., surveillance agents observed MCGOWAN driving his Nissan Maxima in the area of TARGET LOCATION #2. At the same time, agents intercepted a call between MCGOWAN and LONGSHORE over TT-2. During the conversation, MCGOWAN advised LONGSHORE that he (MCGOWAN) believed a suspicious pickup truck in area was possibly following him (MCGOWAN). MCGOWAN asked LONGSHORE to look at out the window (of TARGET LOCATION #2) for anything suspicious. During a subsequent intercepted conversation over TT-2, MCGOWAN told LONGSHORE he (MCGOWAN) saw someone parked on the side of the road. During the intercepted conversation, agents heard a rhythmic mechanical sound, consistent with the operation of a pill press, in the background of LONGSHORE's end of the call. Minutes later, at approximately 12:15 p.m., surveillance agents observed LONGSHORE walk from the driveway of TARGET LOCATION #2 towards his black Honda Accord.

28.    On February 3, 2019, law enforcement agents covertly installed a camera in tree in a wooded area behind TARGET LOCATION #2. The installation was completed

---

[7] Water is a commonly used to produce pills using a pill press.

while TARGET LOCATION #2 was unoccupied. The view of the camera captured live images (that were fed to a monitor at the DEA office), of a side door, the back of TARGET LOCATION #2, and a parking area directly behind TARGET LOCATION #2. Based on physical and electronic surveillance and intercepted conversations over TT-2, I believe LONGSHORE was at TARGET LOCATION #2 and the rhythmic mechanical sound heard in the background was that of a pill press used to manufacture illicit pills. Further, based on the images captured by the camera, agents have determined that no one resides at TARGET LOCATION #2 and that it is used exclusively for the purposes of manufacturing illicit pills and storing controlled substances.

29. On February 5, 2019, at approximately 6:30 a.m., agents established surveillance at TARGET LOCATION #1. At approximately 8:04 a.m., based on location information for TT-2 and physical surveillance, agents observed MCGOWAN leave the area of TARGET LOCATION #1. At approximately 8:34 a.m., agents observed MCGOWAN drive his Nissan Maxima on Mountville Road traveling towards Jefferson Davis Road in Mountville, South Carolina. MCGOWAN was observed by agents turn onto Jefferson Davis Road towards TARGET LOCATION #2 and observed MCGOWAN enter TARGET LOCATION #2 through the side porch area.

30. Later the same day, at approximately 1:21 p.m., agents intercepted a call over between MCGOWAN and LATIMER during which the two discussed LATIMER bringing something back from Columbia. At the same time, via the covert surveillance camera, agents observed MCGOWAN, walk outside towards the wood line at TARGET LOCATION #2. Agents observed MCGOWAN look at and walking directly towards the camera. Over TT-2, agents heard MCGOWAN tell LATIMER he would have to call him (LATIMER) back. Agents then observed MCGOWAN then walk quickly toward the front of TARGET LOCATION #2 where he met LONGSHORE. LONGSHORE and MCGOWAN walked towards the camera. MCGOWAN removed the camera (which was still recording and feeding images to the DEA office) and directed it toward LONGSHORE. MCGOWAN, while

holding the covert camera, followed LONGSHORE into TARGET LOCATION #2. While the camera was inside TARGET LOCATION #2, agents observed live images of a large white storage container (possibly a large white cooler) underneath the kitchen table. On the kitchen counter, agents observed images of a small lamp, a blender, a stainless steel sheet or mirror placed over the sink, and various measuring containers some of which appeared to contain a powder substance. The live footage from inside TARGET LOCATION #2 confirmed agents' belief that TARGET LOCATION #2 was being used to manufacture illicit pills, including heroin/fentanyl pills and store controlled substances.

31.    At 1:52 p.m. on the same day, agents intercepted a call over TT-2 from MCGOWAN to Derrick BLUFORD.[8] MCGOWAN explained that he found a "deer hunting" camera and stated "that's a wrap for that", indicating his belief that it was no longer safe to continue operations at TARGET LOCATION #2. MCGOWAN advised BLUFORD that he is "heading" to "Man", indicating that he (MCGOWAN) was moving the pill press material to another location owned by Kevin Wheeler a/k/a "Man".

32.    On February 5, 2019, at approximately 1:55 p.m., during an intercepted call between MCGOWAN and Kevin Wheeler[9], MCGOWAN told Wheeler he (MCGOWAN) is five minutes away. At approximately 2:06 p.m., MCGOWAN called Wheeler and stated he (MCGOWAN) was there and needed to put "what's its name up." At approximately 2:26 p.m., location data for TT-2 showed TT-2 to be in the area of TARGET LOCATION #3.[10] At approximately 4:26 p.m., during a call intercepted

---

[8] NCIC criminal history check showed that Derrick Bluford has a 1993 felony possession of cocaine and at least two other felony cocaine arrests which were dismissed. Derrick Bluford father is Donell Bluford who is the owner of TARGET LOCATION #2 and has a NCIC criminal history that shows two misdemeanor drug convictions.

[9] NCIC criminal history check showed that Wheeler has a 2009 felony conviction for accessory after the fact of a felony and a 2009 misdemeanor conviction of unlawful carrying of a firearm.

[10] During the course of analyzing location data for TT-2 since January 18, 2019, TT-2 would "ping" regularly in the area of TARGET LOCATION #2 in conjunction with wire intercepts and physical surveillance when MCGOWAN, based on physical surveillance and/or the content of intercepted

over TT-2 between MCGOWAN and Wheeler, MCGOWAN stated he needed to "come there" one more time and "finish what's a name" (setting up the pill press) and Wheeler replied that he was on his way back indicating that MCGOWAN had arrived at the new location ahead of Wheeler. MCGOWAN explained to Wheeler that the "deer hunting" camera, found at TARGET LOCATION #2, he believed was installed by neighbors. MCGOWAN implied to Wheeler it was time for him (MCGOWAN) to leave TARGET LOCATION #2, regardless of the camera because he (MCGOWAN) had been at TARGET LOCATION #2 for a few years and that it had been in operation for too long.

33.    At approximately 4:44 p.m., electronic surveillance data showed TT-2 in the area of TARGET LOCATION #3. Based on the intercepted conversation between MCGOWAN and Wheeler, and my knowledge of the case, I believe MCGOWAN moved his pill press operation to Wheeler's property, TARGET LOCATION #3. According to South Carolina Department of Motor Vehicles records, Wheeler's address is the same as TARGET LOCATION #3.

34.    On February 6, 2019, at approximately 11:55 a.m., agents intercepted a call over TT-2 between MCGOWAN and Tommy Mattison. During the conversation, MCGOWAN told MATTISON that he (MCGOWAN) was doing the same thing he (MCGOWAN) was doing all day yesterday. Based on calls intercepted the previous day, I believe MCGOWAN was implying he (MCGOWAN) was manufacturing heroin/fentanyl pills and was doing that yesterday as well. MCGOWAN also stated he (MCGOWAN) was in the "place (TARGET LOCATION #2) about three years" indicating that it was too long. At approximately 12:04 p.m., electronic surveillance data placed TT-2 in the vicinity of TARGET LOCATION #3. Based on my training and experience I know drug traffickers move bases of operation often to evade

___

conversations, was observed at TARGET LOCATION #2. Since TARGET LOCATION #2 was compromised on February 5, 2019, location data has shown that TT-2 has not been located for any substantive amount of time near TARGET LOCATION #2. An analysis does, however, establish that TT-2 was regularly located in the area of TARGET LOCATION #3 (where TT-2 had not previously previous been located for any significant amount of time prior to the compromise of TARGET LOCATION #2), with accuracy within less than 500 meters.

detection by law enforcement and, based on the context of the conversation, I believe MCGOWAN was referring to the risks of detection associated by operating out of the same location for too long.

35.  On February 7, 2019, at approximately 8:21a.m., agents intercepted a call from MCGOWAN to an unidentified man who advised MCGOWAN that he (the unidentified man) was "in the back" and MCGOWAN replied that he (MCGOWAN) would find him when he (MCGOWAN) arrived.   At the time, location data for TT-2 indicated that TT-2 was in the vicinity of TARGET LOCATION #3. Aerial and surveillance photos of TARGET LOCATION #3 shows that TARGET LOCATION #3 contains a double wide trailer in the front of the property and approximately one hundred yards located towards the back right corner of the property appears to be a storage type outbuilding with a small wooden deck. This description is consistent with the unidentified man stating he was "in the back".  Based on my knowledge of the case and the description of TARGET LOCATION #3, I believe the unidentified man was at TARGET LOCATION #3 to meet MCGOWAN either behind or in the back of a property.

36.  On February 9, 2019, at approximately 10:46 a.m., TT-2 recorded a call between MCGOWAN and LONGSHORE.   MCGOWAN advised LONGSHORE that he (MCGOWAN) was at Walmart. Location data for TT-2 showed that MCGOWAN was at the Walmart located on Grandview Drive in Simpsonville, South Carolina. LONGSHORE asked if MCGOWAN had everything "set up". LONGSHORE advised MCGOWAN that he (LONGSHORE) would be there later.  Based on the context of the call, I believe LONGSHORE was asking whether MCGOWAN had the new pill manufacturing location set up. MCGOWAN told LONGSHORE he was still "cleaning up" (believed to be a reference to setting up the new pill press operation). LONGSHORE advised MCGOWAN he will be at the pill press location shortly. At approximately 11:26 a.m., location data for TT-2 placed TT-2 was at TARGET LOCATION #3.

37.    At approximately 11:42 a.m., location data indicates that TT-2 was in the vicinity of TARGET LOCATION #3.   Minutes later, at approximately 11:46 a.m., agents intercepted a call between Wheeler and MCGOWAN over TT-2.   During the conversation, Wheeler, apparently not on the property at the time, asked whether MCGOWAN was "down there" and MCGOWAN replied, "yes" and stated he (MCGOWAN) needed to "get some water".   WHEELER advised MCGOWAN to walk into the building (TARGET LOCATION #3) and that he (WHEELER) would give him (MCGOWAN) the door alarm code.   WHEELER instructed MCGOWAN to enter the building and input code 1971 to disarm the alarm and to lock the door when he (MCGOWAN) leaves.   At approximately 2:14 p.m., location data for TT-2 indicated TT-2 was in the vicinity of TARGET LOCATION #3.   At approximately 2:27 p.m., agents intercepted another call over TT-2 between MCGOWAN and Wheeler. MCGOWAN confirmed the alarm code and told Wheeler he had "been done for a while" and but had forgotten something. Agents were able to hear the door close as MCGOWAN left the building.

38.    On February 12, 2019, at approximately 10:54 a.m., 11:08 a.m., and 11:24 a.m., location data for TT-2 indicated that TT-2 was in the vicinity of TARGET LOCATION #3.   On February 14, 2019, agents conducting physical surveillance of TARGET LOCATION #3 observed MCGOWAN's vehicle at that location.   Physical surveillance agents also saw a white small car near TARGET LOCATION #3. At approximately 11:01a.m., agents intercepted a call between MCGOWAN and Bluford over TT-2 and during the conversation MCGOWAN advised Bluford that there is a small white car near TARGET LOCATION #3.

39.    On February 15, 2019 at 7:45 a.m. location data for TT-2 indicates TT-2 was in the area of TARGET LOCATION #1. At approximately 8:45 a.m. agents conducting physical surveillance of TARGET LOCATION #3 observed MCGOWAN's vehicle at TARGET LOCATION #3 and noted the vehicle remained at TARGET LOCATION #3 for several hours. During this time, MCGOWAN made and received multiple calls over TT-2.  In the background of those calls, agents observed multiple

times, the repetitive mechanical sound consistent with the operation of an electric pill press.

## CONCLUSION

40.    Based on the above facts and circumstances, your Affiant believes there to be probable cause and requests that a search warrant be issued for the properties described herein, and more particularly described in Attachment A to search for the items enumerated in Attachment B.  This Affiant knows these items to be fruits, evidence and/or instrumentalities of violations of violations of Title 21, U.S.C. §§ 841(a)(1), 846; Title 18 U.S.C. § 1956(h) and § 856.

41.    I further requests that the Court order that all papers in support of this application, including the affidavit, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Making this affidavit public before the warrants are executed could interfere with ability of law enforcement officers to safely execute the warrant. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

RANDY L. SMITH, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Subscribed to and sworn before me this 22 day of February, 2019

JACQUELYN D. AUSTIN
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## 320 Scenic Lake Court Piedmont, SC 29673 (TL#1)

**DIRECTIONS:**

Traveling South on SC-291 from Greenville, South Carolina, you would turn left onto Old Augusta Road, and a slight left onto Fork Shoals Road. One would continue South on Fork Shoals until you reached Log Shoals Road. You will turn Right onto Log Shoals Road and the Left onto Quite Lake Court. Once on Quite Lake Court, turn Left onto Scenic Lake Court. 320 Scenic Lake Court will be on the Right. The residence at 320 Scenic Lake Court is further described as a three level single family dwelling composed of brown brick, and tan vinyl siding with brown shutters. The roof is composed of gray slate shingles.



# ATTACHMENT A

## 4090 Jefferson David Road Mountville, SC (TL#2)

### DIRECTIONS:

If one was traveling South on Old Milton Road in Laurens County from Clinton, South Carolina, you would make a sharp right turn onto Jefferson Davis Road. You will continue South West on Jefferson Davis Road, and then turn right onto Hollow Drive. Once on Hollow Drive, bear to the right when the road splits, and 4090 Jefferson Davis Road will be on the right. 4090 Jefferson Davis Road is further described as a as a house with a gray slate shingled roof. The exterior of the residence is off white, with light blue shutters.



## ATTACHMENT A

### 6145 Highway 221 South, Laurens, SC 29360 (TL#3)

**DIRECTIONS:**

If one were traveling South East on Interstate 385 from Greenville, South Carolina, you would take Exit 9, US-221 towards Laurens/Enoree. Keep left to take the ramp towards Laurens. Turn left onto Highway 221/US-221 South, continue to follow US-221 South. 6145 Highway 221 South will be on your left. 6145 Highway South is further described as a white vinyl sided double wide mobile home, with a black slate roof, black shutters and a covered front porch. There is also an outbuilding that has white siding, several windows on the side near the property boundary and a small wooden deck that has patio furniture with a red umbrella. Adjacent to this building is a second barn shaped outbuilding that is brown in color, with a dark colored roof. On the property, to the far left of this outbuilding is a white and black metal-type building.




# ATTACHMENT B

## Particular Things to be Seized

The items to be seized, listed as follows, constitute fruits, evidence and/or instrumentalities of violations of Title 21 U.S.C. §§ 841(a)(1) and 846; and Title 18 U.S.C. §§ 1956(h) and 856.

1.    Controlled substances, including, but not limited to, heroin and cocaine.

2.    Items used to facilitate the packaging, processing, weighing, transportation, concealment, and/or other aspects of the distribution of illegal drugs, to include scales, sifters, hammers, grinders, glass panes, mirrors, kilo-presses, pound-presses, heat sealing devices, paper bags, burlap bags, plastic bags, razor blades, plastic containers, shipping receipts, bills of lading, shipping containers, mechanics grease, axle grease, any substance used to mask the detection of illegal narcotics, money counting devices, aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease, and/or other paraphernalia.

3.    Records accounting for the distribution of illegal drugs and the remittance of drug proceeds, to include narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, computer spreadsheets, correspondence, notation logs, receipts, journals, books, pay/owe sheets, records and other documents noting price/quantity, dates and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed.

4.    Lists of customers and related identifying information; types, amounts and prices of drugs trafficked as well as places and amounts of specific transactions; any information relating to sources of narcotics/drugs (including names, addresses, phone numbers, or any other identifying information); any information recording travel, including airline tickets, travel itineraries, rental car receipts or any information pertaining to travel records, hotel receipts, maps and written directions.

5.    Secreted contraband, proceeds of drug sales and/or records of drug transactions, which may be stored in secure locations within residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes, vehicles and obscure locations such as storage containers buried underground in order to conceal such items from law enforcement authorities.

6.    Records including: personal telephone and address books and listings, diaries, passports, drivers licenses and/or identification cards, immigration documentation, birth certificates, keys, personal calendars, letters, cables, telegrams, indicia of occupancy, residency or

ownership of premises, loan payment receipts, rent receipts utility bills, telephone bills, photographs, audio tapes, video tapes, CDs/DVDs and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in narcotics trafficking activities.

7. Articles of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises and/or vehicle, to include cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility, and telephone bills, tax documentation, travel documents, statements, passports, drivers licenses and/or identification cards, immigration documentation, birth certificates, and keys.

8. United States and foreign currency, precious metals, jewelry, cashier's checks, money orders and/or other financial instruments or items of value; records, documents, or other evidence relating to financial transactions, income, banking, and expenditures of money and wealth, to include documents and records relating to the existence or use of foreign and domestic banks and their attendant services, securities, cashier's checks, bonds, money drafts, letters of credit, brokerage houses, the purchase of real estate or vehicles, the establishment of shell corporations and business fronts; records, documents, or other evidence relating to the existence of wire transfers, cashier's checks, and money orders, and money counting machines and any other record which identifies individuals or businesses with whom a financial relationship exists, and other items evidencing, secreting, transfer, concealment, and/or expenditure of money.

9. Bank account records, wire transfer records, bank statements, safe deposit keys and records, money containers, financial records of brokerage houses, real estate corporations and other financial services entities.

10. Records, documents, and deeds reflecting the purchase or lease/rent of real estate, vehicles, precious metals, jewelry, storage units or facilities and keys to storage units or facilities, and/or other items obtained with the proceeds from sales of controlled substances.

11. Vehicle title documents, automobile registration materials, and/or car keys.

12. Devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors, anti-bugging devices, devices used to detect the presence of wiretaps, recording devices or transmitters, and/or receipts or literature describing the same, any other communication devices which could be used to participate in a conspiracy to distribute controlled substances;

2

13.   Photographs, negatives, video tapes, films, underdeveloped film and the contents therein, and slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled substances.

14.   Vehicles located at the Target Locations and/or under the control of individuals involved in manufacturing, and distribution of controlled substances.

15.   Weapons and firearms, including handguns, pistols, revolvers, rifles, shotguns, silencers, ammunition, explosives, incendiary devices, or any other weapon that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances.

16.   Electronic and digital items: cellular telephones, satellite phones, digital recording devices, digital camera(s) and their accompanying memory cards, personal digital assistant devices, and tablet devices to include Apple iPads or iPods, Windows or Android-based tablets.

   a.   Law enforcement personnel or other individuals assisting law enforcement personnel will, in their discretion, seize the aforementioned digital device(s) and transport the device(s) to an appropriate law enforcement laboratory or similar facility pending the application for a separate warrant authorizing the search of these items at that location.

   b.   Should the device(s) be transported to an appropriate law enforcement laboratory or facility for examination, law enforcement will obtain, at a later date, separate authorization to search the internal digital data stored on the digital devices, as soon as practicable but not to exceed 120 days from the date of execution of this warrant.

   c.   If law enforcement does not apply for a separate search warrant for the digital and electronic devises OR if a search warrant for these items is not issued, the seized electronic and digital items will be returned as expeditiously as possible.